UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TODD DEISTER,

     Plaintiff,

v.

AAA AUTO CLUB OF MICHIGAN,

     Defendant.

Case No. 13-cv-13993
Honorable Laurie J. Michelson
Magistrate Judge Michael J. Hluchaniuk

---

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT [18] AND DENYING PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT [22]**

---

After a tornado caused property damage in Louisville, Kentucky, in March 2012, Defendant AAA Auto Club of Michigan ("Auto Club") dispatched its Claim Specialist, Plaintiff Todd Deister, to the area to assist in adjusting losses and distributing funds to Auto Club's insureds. While on this assignment, Deister's computer went down. Deister had been struggling to learn the Auto Club's computer system and the job stress caused him to have a panic attack. Upon his return to Michigan, Deister was diagnosed with acute stress reaction and took a short-term disability leave of absence from work. He was cleared to return to work without restrictions on August 1, 2012. Deister claims that in the week leading up to his return date, he sought a reasonable accommodation for his disability but the Auto Club refused to engage in the legally-mandated interactive process to address the request. When Plaintiff failed to return to work on August 1, 2012, he was terminated effective August 7, 2012. Deister then brought this lawsuit alleging that he was unlawfully terminated and retaliated against because of his disability. Following extensive discovery, both parties moved for summary judgment.

For the reasons that follow, the Auto Club's Motion for Summary Judgment (Dkt. 18) is GRANTED and Deister's Motion for Partial Summary Judgment (Dkt. 22) is DENIED.

## I.  FACTS

The following facts are undisputed for purposes of summary judgment unless otherwise indicated.[1]

Deister began working for Auto Club as a claims adjuster on September 12, 2011. (Pl.'s Mot. Ex. 6 at Pg ID 472; Pl.'s Mot. Summ. J. Ex.1, Deister Decl. ¶ 1; Def.'s Counter-Statement of Material Facts ¶ 1.) Before Auto Club hired him, Deister had worked as a property claims adjuster for more than twenty-five years. (Deister Decl. ¶ 2; Def.'s Counter-Statement ¶ 1.)

Deister worked from home when not dispatched to a property claim location. (Def.'s Mot. Ex. A, Deister Dep. at 15.) His direct supervisor at Auto Club was Christopher Ruby. (Pl.'s Mot. Ex. 5 at Pg ID 448; Deister Decl. ¶ 4; Deister Dep. at 20–21.) In a performance review for Deister on January 10, 2012, Ruby wrote:

> Although Todd has only been with ACG a short time management has seen he has been a positive contributor to the unit and merits a fully met. Management will work with him to improve any issues he is having regarding computer use,

---

[1] The Court's Case Management Requirements were filed in this case on May 7, 2014, upon reassignment of the case to the undersigned and before the present motions were filed. (Dkt. 16.) They provide that on a motion for summary judgment, "[a]ll material facts set forth in the [movant's] Statement of Material Facts will be deemed to be admitted unless controverted by the [respondent's] Counter-Statement of Material Facts." (Dkt. 16, Case Management Requirements ¶ 5(b).) Deister did not provide a Counter-Statement of Material Facts in response to Defendant's motion. In his reply brief in support of his motion for partial summary judgment, Deister apologized for this omission but noted that he "did however offer an organized Declaration under oath that stated precisely what his testimony would be if he gets the opportunity to go to trial . . . based on his personal knowledge of his interaction with Joanne Hines and Rosita Brockington fully supported by deposition testimony, his own medical records, and the records and documents of the Auto Club." (Dkt. 30 at 1.) Therefore, to the extent the Defendant's Statement of Material Facts is sufficiently supported by the cited evidence and is not contradicted by admissible evidence in Plaintiff's declaration, it is deemed undisputed for the purpose of the present motions.

> working with estimating system and ACG policy and claims handling standards to
> make him as comfortable as possible with his new position.

(Pl.'s Mot. Ex. 5 at Pg ID 463.) "Fully met expectations" was the middle position in a five-point scale for the performance review, ranging from "Did not meet expectations" to "Exceeded expectations." (*Id.*)

On March 4, 2012, Ruby instructed Deister to travel to Kentucky to adjust property claims for tornado damage. (Deister Decl. ¶13; Deister Dep. at 31.) While in Kentucky, on March 8, 2012, Deister began experiencing shakiness and poor concentration. (Deister Decl. ¶¶ 21–22; Def.'s Counter-Statement ¶ 5.) After his computer went down, he developed panic attacks and memory loss. (Deister Decl. ¶¶ 23–24; Def.'s Counter-Statement ¶ 6.) At 5:56 PM, Deister emailed Ruby:

> I am leaving for home tonight due to panic / stress attacks and to meet with my
> doctor tomorrow. I will leave my files with Aht. Please advise if you need
> anything else before I leave.

(Pl.'s Mot. Ex. 2.) At 7:02 PM, Ruby replied:

> Todd, Sorry to hear that. Rob is going to come by to get the files. What about the
> losses you inspected did you write the estimates? Please checkout of the hotel you
> will not deploy back if able. Please let me know how you are. I ho[pe] everything
> is ok. Drive safe.

(*Id.*)

Deister saw his primary care doctor, Mary Baldwin, M.D., the next day. (Deister Decl. ¶ 27; Pl.'s Mot. Ex. 3; Def.'s Counter-Statement ¶¶ 12–13.) Based on that examination, Dr. Baldwin signed, on March 8, 2012, a "Statement of Disability" form provided by the Auto Club's disability benefits administrator, The Hartford Life and Accident Insurance Company. (Pl.'s Mot. Ex. 3; Def.'s Counter-Statement ¶¶ 11–12.) In the space provided for a diagnosis, Dr. Baldwin wrote "acute stress reaction[:] supervisor belittles him, gives conflicting orders and

3

wrong information." (Pl.'s Mot. Ex. 3 at Pg ID 438.) Dr. Baldwin indicated that Deister's ability to function was 50 percent or more limited in certain categories of activity, including performing a variety of duties, dealing with people, and making judgments and decisions. (*Id.* at Pg ID 439.) She indicated that his symptoms first became severe enough to preclude social or occupational functioning on March 8, 2012, and that his psychiatric limitations were expected to last one month. (*Id.*)

Deister took a medical leave from work beginning March 9, 2012. (Deister Dep. Ex. 5 at Pg ID 159.) On March 12, 2012, he faxed Auto Club Human Resources ("HR") employee Rosita Brockington a "Disability Certificate" signed by Dr. Baldwin, which indicated that Deister was unable to work beginning March 3, 2012, he could return to work on April 9, 2012, his diagnosis was "acute stress reaction," and his prognosis was "good." (Pl.'s Resp. Ex. 6 at Pg ID 747–48.)

In a letter dated March 23, 2012, the Auto Club acknowledged Deister's claim for disability leave and explained some of the Auto Club's policies and procedures for disability leave and disability benefits. (Deister Dep. Ex. 5 at Pg ID 159.) Deister received the letter on or about March 23. (Deister Dep. at 59.) The letter stated, "You may be replaced after 90 days of absence in a rolling 12 month period (unless otherwise protected by Family and Medical Leave)." (Deister Dep. Ex. 5 at Pg ID 159.) A "Frequently Asked Questions" document enclosed with the letter explained further: "If your position is not available upon your return-to-work, you will be placed in a layoff status for up to ninety (90) calendar days. If you have not obtained a suitable position with [the Auto Club] by the end of the layoff period, your employment will be terminated." (*Id.* at Pg ID 166.) An excerpt from the Auto Club "Employment Policy Guide" enclosed with the letter stated: "failure to return to work when released by the disability administrator or as instructed by the company may result in termination." (*Id.* at Pg ID 169.)

4

Deister applied for and received short-term disability benefits through the Auto Club's disability benefit plan, administered by The Hartford. (Deister Dep. Ex. 7 at Pg ID 171.) The Hartford initially awarded benefits for the period March 16, 2012, through May 31, 2012. (*Id.*) On May 31, 2012, his benefits were extended through July 1, 2012. (Deister Dep. Ex. 8 at Pg ID 172.)

Ruby sent Deister a letter dated June 8, 2012. (*See* Pl.'s Mot. Ex. 9.) Because of its importance to several issues in this case, the contents of the letter are reproduced in full here:

> I am writing to review with you relevant company procedures as they relate to your current absence.
>
> The company holds an employee's position open for 90 consecutive calendar days of disability or the expiration of the employee's Grandfathered Extended Sick Leave or Family and Medical Leave, whichever is longer. In your case, more than 90 calendar days have elapsed and business conditions require that we fill the vacancy.
>
> In addition, you will not accrue PTO for any full calendar month you are absent while you are on leave.
>
> When you have a projected return to work date, please contact Benefits at 313-[XXX-XXXX].
>
> When the company is notified by Hartford that you are no longer eligible for disability benefits, you will be placed in a layoff status. While you are on layoff status, you may seek new employment opportunities within the company.
>
> Please see the enclosed information sheet on how to apply for open positions. Human Resources/Staffing is available to assist you in finding suitable employment. Questions regarding suitable employment should be referred to Staffing at 313-[XXX-XXXX].You will remain on layoff status for a maximum of three months. If you are unable to locate suitable employment during your layoff period, your employment will be terminated.

(*Id.*) Deister received the letter in June 2012. (*See* Deister Decl. ¶ 73; Deister Dep. at 159; Pl.'s Mot. Ex. 4 at Pg ID 445.)

Ruby sent Deister another letter, dated June 26, 2012, in which he said, "I am writing to request the return of company-owned equipment." (Deister Dep. Ex. 12 at Pg ID 174.) After listing the car, computer, and other items for which he was requesting return, Ruby wrote: "Please contact me . . . to make arrangements for the return/pick-up of the equipment by no later than noon on Friday, June 29, 2012. If you fail to contact me by this deadline, you will leave me no other choice but to pursue recovery through other legal channels." (*Id.*) This letter was prepared by HR employee Brockington for Ruby's signature, using a template Brockington had used multiple times before. (Brockington Decl. ¶ 2; Pl.'s Resp. Ex. 13, Ruby Dep. at 37, 71–72.) Deister received the letter and contacted Ruby by the deadline. (*See* Deister Dep. at 100; Def.'s Mot. Ex. E, Ruby Decl. Ex. 1 at Pg ID 218.) Deister returned the equipment in June 2012. (Def.'s Mot. Ex. D, Brockington Decl. ¶ 2; *see* Deister Decl. ¶ 67.)

On July 5, 2012, Deister's short term disability benefits were extended through July 31, 2012. (Deister Dep. Ex. 13 at Pg ID 175.) The Hartford advised Deister by letter: "If your disability is extended beyond this date, it will be necessary for your physician to provide us with medical evidence to support the extension." (*Id.*)

On July 19, 2012, Deister's psychiatrist, Dr. T. L. Ittiara, met with Deister and determined that he would be able to return to work on August 1, 2012. (Pl.'s Mot. Ex. 4 at Pg ID 446.) Deister testified at his deposition that this was the final assessment by a health care professional regarding the duration of his medical leave. (Deister Dep. at 80.) He testified that he was able to return to work on August 1, 2012. (*Id.* at 89, 92–93.) And he testified that he understood that he was supposed to return to work on August 1, 2012. (*Id.* at 113, 117.) But he also testified that he was not sure how or where he was supposed to report to work. (*Id.* at 96). Deister notes (and Defendants do not appear to dispute) that he did not have an identification

6

card to enter the Auto Club office building. (Deister Decl. ¶ 67; *see* Def.'s Counter-Statement ¶ 42.)

The Auto Club's procedures for an employee returning from work after disability leave are not entirely clear. In particular, the parties dispute whether a returning employee's manager is required to do anything before the employee returns. Defendants cite the Summary Program Description for the Auto Club's short-term disability program, which makes the employee responsible for contacting his manager about returning to work after notification from the leave administrator:

> When you are no longer disabled and may return to work, you and your manager will receive notification from Hartford regarding the date you should return to work. *Prior to your release to work date, you should contact your manager* to confirm the date you are returning to work or to discuss other arrangements such as extending your leave as a Personal Leave of Absence or under the Family & Medical Leave Act, if eligible. If you disagree with the determination made by Hartford and have plans to appeal the decision, you must notify your manager on or before the date you have been released to return to work.

(Def.'s Mot. Ex. B at Pg ID 187 (emphasis added).) A screenshot from an Auto Club intranet page regarding disability leaves of absence which was attached to the Auto Club's response to Deister's EEOC charge also indicates that the employee should contact his manager to start the process. (Pl.'s Resp. Ex. 6 at Pg ID 753.) The intranet page states: "The Leave Team will notify your manager of the approval of your disability claim and the anticipated return to work date. When you are released to return to work, you should immediately notify both Hartford and your manager. On the day you return to work, your manager will complete the necessary paperwork to return you to active status in order to ensure your regular paychecks are issued accordingly." (*Id.*) Thus according to this intranet page, the manager does not complete the necessary paperwork until "the day you return to work." *Id.*

7

The June 8 letter Ruby sent Deister also put the onus on the employee to start the return process, but it said to contact HR rather than Ruby: "When you have a projected return to work date, please contact Benefits at 313-[XXX-XXXX]." (Pl.'s Mot. Ex. 9.)

But Deister argues that the returning employee's supervisor is supposed to initiate the return-to-work process by submitting a form *before* the employee returns to work. For support, he provides a screenshot of a different Auto Club intranet page that addresses managers' responsibilities related to disability leaves of absence. (Pl.'s Resp. Ex. 12.) It provides: "When your employee is released to return to work or Hartford has denied or ended benefits, it is your responsibility to notify the Leave team by completing the LOA Return-to-Work Notification (eForm). If this eForm is not completed in a timely manner, an employee's regular paycheck may be delayed." (*Id.*)

Brockington testified at her deposition that the only paperwork required for Deister to return to work from disability leave on August 1 was a "return-to-work e-form," which is not sent until the employee reports to work or fails to report to work. (Pl.'s Mot. Ex. 11, Brockington Dep. at 41–42.) Another Auto Club Human Resources employee, Joann Hines, testified that the HR Leave Team does not do anything to process the employee's return until the return-to-work form is submitted by the returning employee's manager "indicating the employee is back at work." (*See* Pl.'s Mot. Ex. 10, Hines Dep. at 44–45, 47–48.) She also said, "The employees can return back to work at their location without speaking to me or any member of the Leave Team. They report back to their branch or wherever their location is." (*Id.* at 48.) This testimony is in accord with an email sent on July 6 to Ruby from the Auto Club's Leave of Absence Team, indicating that Ruby did not need to take any action until Deister's estimated return-to-work date, August 1. (*See* Pl.'s Resp. Ex. 13, Ruby Dep. Ex. 3 at Pg ID 1016.)

It appears to be undisputed that Ruby did not submit a return-to-work eForm for Deister. (*See* Ruby Dep. Ex. 4 at Pg ID 1017; Brockington Dep. at 42; Hines Dep. at 45.) And both parties confirmed at the hearing that Ruby did not contact Deister at any time about returning to work, and Deister did not contact Ruby at any time about returning to work. (*See* Deister Dep. at 141; Ruby Dep. at 76; Ruby Dep. Ex. 3 at Pg ID 1016.)

Deister instead called his Human Resources contact at the Auto Club, Hines, on July 24, 2012. (Deister Decl. ¶ 45; Def.'s Counter-Statement ¶ 20; Hines Dep. at 41.) By doing so, he followed the instructions in the June 8 letter from Ruby. (*See* Pl.'s Mot. Ex. 9.) Deister asked to meet with Hines about "options." (Deister Decl. ¶ 50; Def.'s Counter-Statement ¶ 26; Hines Dep. at 42.) Hines told Deister that August 1, 2012, was the first day she could meet with him. (Deister Decl. ¶ 51; Def.'s Counter-Statement ¶ 27; Hines Dep. at 47.) Deister asked for an earlier meeting because his leave would end on July 31, 2012. (Deister Decl. ¶ 51; Counter-Statement ¶ 28; Hines Dep. at 47.) Hines told Deister it would not be a problem. (Deister Decl. ¶¶ 58–59; Counter-Statement ¶ 28.)

After scheduling the meeting with Deister, Hines mentioned it to a coworker, who advised her to call Brockington "and inform her that Mr. Deister wanted to come in to meet, discuss options." (Hines Dep. 62–63; Def.'s Counter-Statement ¶ 32.) Brockington was responsible for handling reasonable accommodation requests. (Hines Dep. 64–65; Brockington Dep. 52; Deister Decl. ¶¶ 86–87; Def.'s Counter-Statement ¶¶ 32, 61.) On July 31, 2012, at 1:24 P.M., Hines left the following voicemail for Deister:

> Hi Todd, this is JoAnn Hines with AAA's Leave Team, and I know we are scheduled to meet tomorrow at 9:00 and I believe you said to speak over, um, or just kind of go over your options. And if there is questions in regards to your leave, that's something I can assist you with. But if it is something in regards to like the option for employment with a 90-day letter, then you would actually need to meet with Rosita Brockington in Employee Relations Department. . . .

However, if it is something in regards to the leave, I have not a problem. We can still stay on for the meeting at 9:00. Please call to confirm so I will know either way so I will know. . . Okay. Please give me a call. Bye.

(Pl.'s Mot. Ex. 7; *see* Deister Decl. ¶ 62.)

Deister left a message for Brockington on July 31. (Def.'s Counterstatement ¶ 40.) She called him back the morning of August 1 and he returned her call at 2:10 P.M. that day. (*Id.* ¶ 41; Deister Decl. ¶ 66.) The parties do not agree on everything that was said during their conversation. Deister says he asked whether Brockington had seen his medical records, and when she did not respond, he told her that she needed to review his medical records. (Deister Decl. ¶¶ 68–69.) Brockington does not recall whether Deister brought up his medical records. (*See* Brockington Dep. 37–41.) There is no dispute, however, that Brockington referred Deister to "the 90-day letter" that Ruby sent Deister on June 8. (Deister Decl. ¶¶ 72–73; Def.'s Counterstatement ¶ 47.)[2] There is also no dispute that Brockington told Deister he must return to his former position because it had not been filled. (Deister Decl. ¶ 75; Def.'s Counter-Statement ¶ 50; *see* Brockington Dep. at 36; Deister Dep. 160.) And there is no dispute that Deister told Brockington he would not return that day to his former position under the same manager, Ruby. (Deister Decl. ¶¶ 77, 80; Def.'s Counter-Statement ¶ 52; Brockington Dep. at 36, 61–63.)

Brockington sent Deister a letter dated August 6, 2012, stating:

I am writing you regarding your employment status. According to Hartford, you have been released to return to work without restrictions effective August 1, 2012. In several telephone conversations with me, you stated that you are unable or unwilling to return to your previous position. You also asked whether you would be eligible for severance benefits. Company policy does not allow for severance benefits for employees who decline to return to their assigned job position from a

---

[2] Deister told Brockington that he never received the letter. (Deister Decl. ¶ 73.) She told him she would overnight a copy of it. (Deister Decl. ¶ 74; Deister Dep. at 160.) He received a second copy of it on August 2, 2012. He then realized that she was referring to the June 8 letter from Ruby, which he had in fact received the first time it was sent. (*See* Deister Decl. ¶ 73; Deister Dep. at 159; Pl.'s Mot. Ex. 4 at Pg ID 445.)

disability leave of absence. Because you have chosen not to return to your former position, your employment will be terminated effective August 7, 2012.

You are welcome to review any current job postings within the company as advertised on the company website, but you will be considered an external candidate if you elect to apply for any posted position.

(Pl.'s Mot. Ex. 8; *see* Brockington Dep. at 56; Brockington Decl. ¶ 6.)

Deister did not apply for any jobs at the Auto Club after receiving the letter, and did not use the Auto Club's appeal process to challenge his termination. (Brockington Decl. ¶¶ 6–7.) Deister's former position at the Auto Club remained open and posted on the Auto Club's web site for more than six months after Deister's termination. (Ruby Decl. ¶ 2.)

Deister filed a charge of disability discrimination against the Auto Club with the Equal Employment Opportunity Commission on October 10, 2012. (Deister Dep. Ex. 17 at Pg ID 176.) The EEOC issued Deister a right-to-sue letter for the disability discrimination charge on February 27, 2013. (Def.'s Mot. Ex. F.) Deister filed this suit on May 23, 2013. (Dkt. 1-1, Compl.)

Deister testified at his deposition in January 2014 that the last time he was treated for psychiatric or psychological issues was August 2012, and that he has not felt the need to seek such treatment since that time. (Deister Dep. at 25.) He further testified that since August 2012, he considered himself to be in good shape emotionally, psychologically, and physically. (*Id.*)

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Hedrick v. Western Reserve Care Sys.*, 355 F.3d 444, 451 (6th Cir. 2004 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A fact is material

only if its resolution will affect the outcome of the lawsuit." *Hedrick*, 355 F.3d at 451–52 (citing *Anderson*, 477 U.S. at 248). In evaluating a motion for summary judgment, this Court views the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In considering the parties' cross-motions, this Court "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the non-moving party." *Beck v. City of Cleveland*, 390 F.3d 912, 917 (6th Cir. 2004) (quoting *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994)). Further, "[t]he filing of cross motions for summary judgment does not necessarily mean that an award of summary judgment is appropriate." *Beck*, 390 F.3d at 917. Instead, the Court must evaluate whether either party has carried its respective burden to succeed on its motion.

If the moving party bears the burden of persuasion at trial, "his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quotation omitted). If the moving party does not bear the burden of persuasion at trial, it may discharge its initial burden either by "submit[ing] affirmative evidence that negates an essential element of the nonmoving party's claim. . . . [or] by demonstrat[ing] to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986). If this burden is met, the non-moving party "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587.

## III. ANALYSIS

Deister brings two federal claims against the Auto Club in this action: discrimination on the basis of disability (Count I) and retaliation discrimination (Count III), both in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–12213, and the Civil Rights Act, 42 U.S.C. § 2000e-5.[3] (Dkt. 1-1, Compl.) The Auto Club has moved for summary judgment in its favor on both claims. (Dkt. 18, Def.'s Mot.) Deister has moved for partial summary judgment. (Dkt. 22, Pl.'s Mot.) It is unclear which part of his case Deister believes he is entitled to summary judgment on, especially as Deister argues in response to the Auto Club's motion that "Plaintiff has raised a genuine issue of material fact on each and every necessary element of the causes of action claimed in this matter." (Pl.'s Resp. at Pg ID 656.)

As explained below, the Court finds first that a reasonable finder of fact could find that Deister was disabled under the ADA, and that Deister has established a prima facie case of discrimination. But the Auto Club is entitled to summary judgment on Deister's claim that he was terminated in violation of the ADA because the termination letter stated a legitimate, non-discriminatory explanation for terminating him, and Deister has not produced evidence from which a finder of fact could reasonably doubt the explanation. As for Deister's claim that the Auto Club failed to accommodate his disability, the Court finds that Deister cannot meet his burdens to show that he requested an accommodation, that the Auto Club knew he needed an accommodation, or that a reasonable accommodation was possible. Finally, Deister's retaliation claim is barred for failure to exhaust administrative remedies.

---

[3] The Honorable Lawrence P. Zatkoff, who presided over this case before it was reassigned to the undersigned, remanded Deister's state law claims to the state court in which Deister originally filed his complaint. (*See* Dkt. 4.)

**A.  Deister May Be Disabled under the ADA**

The ADA makes it unlawful for an employer to "discriminate against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). A "qualified individual" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The term "disability" means "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Regarding prong (A), "[m]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). An individual may not qualify as disabled under prong (C), for "being regarded as having such an impairment" if the impairment is "transitory," meaning "an impairment with an actual or expected duration of 6 months or less," "and minor." 42 U.S.C. § 12102(3)(B). But this requirement does not apply to an impairment that qualifies under the "actual disability" or "record of disability" prongs of the definition; as to those, "[t]he effects of an impairment lasting or expected to last fewer than six months can be substantially limiting within the meaning of this section." 29 C.F.R. § 1630.2(j)(ix).

The scope of the definition is intended to be expansive: the ADA Amendments Act of 2008 added rules of construction that the definition of disability should "be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter." 42 U.S.C. § 12102(4)(A); *see also* 29 C.F.R. § 1630.1(c)(4) ("The primary object of attention in cases brought under the ADA should be whether covered entities have

complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of disability. The question of whether an individual meets the definition of disability under this part should not demand extensive analysis."). The new rules of construction also provide that "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 42 U.S.C. § 12102(4)(D).

The Auto Club argues that Deister cannot establish that he is disabled under the ADA. (Def.'s Mot. at 11–13; Def.'s Resp. at 12–17.) In particular, the Auto Club argues that "his condition was temporary and due to stress caused by his supervisor." The Sixth Circuit has rejected a similar argument. In *Cardenas-Meade v. Pfizer, Inc.*, 510 F. App'x 367 (6th Cir. 2013), the district court had held that the plaintiff was not disabled because the "major life activity of working is not 'substantially limited' if plaintiff merely cannot work under a certain supervisor because of anxiety and stress related to his review of her job performance." *Id.* at 370. But the Sixth Circuit noted that the record included a below-average "global assessment of functioning" score from the plaintiff's doctor and testimony from the plaintiff that her illness substantially affected her eating, sleeping, concentrating, and daily functioning. *Id.* The Court said the district court had misunderstood the plaintiff's claim, and "the fact that a triggering event occurs in the workplace should not dictate how a court considers the impact of an ailment on non-work major life activities." *Id.*

Similarly here, Deister does not argue that working for a particular supervisor was the major life activity that was substantially limited by his illness such that he meets the definition of disability. The Statement of Disability that Deister's primary care doctor submitted to the Hartford in March 2012 in support of his disability leave request indicated that Deister's ability to function was 50 percent or more limited in several categories of activity, including performing

15

a variety of duties, dealing with people, and making judgments and decisions. (Pl.'s Mot. Ex. 3 at Pg ID 439.) This evidence is certainly sufficient for a reasonable fact-finder to conclude that Deister had an impairment that substantially limits one or more major life activities.

The Auto Club also argues that Deister was not disabled because his condition was temporary. Deister was cleared to return to work on August 1, 2012, (Pl.'s Mot. Ex. 4 at Pg ID 446) less than five months after starting his leave, and he testified in January 2014 that his symptoms had not recurred in the intervening 18 months (*see* Deister Dep. at 25). In response, Deister points to a statement in his psychiatrist's intake notes that Deister "had periods of depression off and on since early 20's." (Pl.'s Reply at 4 (quoting Pl.'s Mot. Ex. 4 at Pg ID 442); *see also* Deister Decl. ¶ 35 ("In the early nineties, I suffered from depression for a period of about two years.").) Thus, Deister argues, his depression "does not appear to be a transitory impairment because it has been around for 20 years." (*See* Pl.'s Reply at 6.)

In *Cardenas-Meade*, the Sixth Circuit went on to affirm the award of summary judgment for defendant because, the court said, the plaintiff "has been unable to direct this court to evidence that the limits on her non-work activities were anything more than a short-term, temporary result of the anxiety and depression triggered by actions leading up to and during" a stressful situation at work. *Cardenas-Meade*, 510 Fed. App'x at 371. In fact, the plaintiff testified that she was feeling a lot better within about six months. *Id.* And there was no evidence that plaintiff's treating physicians "considered her anxiety and depression to be a permanent condition or one with a 'long-term impact.'" *Id.* Here, Deister's psychiatrist did diagnose him with "recurrent" depression, and there is some evidence that it had occurred previously. But there is no indication whether Deister's ability to function was similarly impaired in previous bouts of depression. Crucially, however, *Cardenas-Meade* was decided under the pre-amendment ADA.

16

*Id.* The ADA now expressly states that "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 42 U.S.C. § 12102(4)(D); *see also* 29 C.F.R. § 1630.2(j)(1)(ix) ("The effects of an impairment lasting or expected to last fewer than six months can be substantially limiting within the meaning of this section."); 29 C.F.R. § 1630.2(j)(1)(iv) ("[T]he term "substantially limits" shall be interpreted and applied to require a degree of functional limitation that is lower than the standard for "substantially limits" applied prior to the ADAAA.").

In light of the low threshold for a qualifying disability under the amended ADA, the evidence is sufficient that a reasonable finder of fact could find that Deister has an episodic disability that substantially limits a major life activity when active, and therefore he meets the definition of disabled. *See Beair v. Summit Polymers*, No. 11-420, 2013 WL 4099196, at *3 (E.D. Ky. Aug. 13, 2013) (finding evidence that plaintiff had been diagnosed with major depressive disorder and PTSD was sufficient to meet the low threshold for a qualifying disability).

### B.  Deister Can Establish a Prima Facie Case of Disability Discrimination

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248 (1981), the Supreme Court set forth the now familiar framework for proving employment discrimination without direct evidence. The plaintiff must first establish a prima facie case of discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 802. The burden then shifts to the defendant to articulate a non-discriminatory explanation for the employment action. *Id.* at 802–03. If the defendant does so, the burden shifts back to the plaintiff to prove that the defendant's explanation is pretextual. *Id.* at 804.

17

The Auto Club argues that Deister cannot establish a prima facie case of discrimination because he cannot show that his employment was terminated due to disability discrimination. (Def.'s Mot. at 15; Def.'s Resp. at 21–24.) According to the Auto Club, "To establish a prima facie case of disability discrimination, Plaintiff must show '(1) that she or he is an individual with a disability, (2) who was otherwise qualified to perform a job's requirements, with or without reasonable accommodation; and (3) who was discriminated against solely because of the disability.'" (Def.'s Mot. at 10–11 (quoting *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008)). But the Sixth Circuit no longer requires a plaintiff to establish that the adverse employment action was "solely" because of his or her disability to recover under the ADA. *See Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 317 (6th Cir. 2012) (en banc). Instead, the Sixth Circuit requires that plaintiff show his or her disability was a "but-for" cause of the employer's adverse decision. *Id.* at 321.

At the prima facie stage, the plaintiff's burden is to show that (1) he or she is disabled but (2) otherwise qualified for the position, with or without reasonable accommodation; (3) he or she suffered an adverse employment decision; (4) the employer knew or had reason to know of the plaintiff's disability; and (5) either the position remained open; he was replaced by a non-disabled person; or similarly-situated non-disabled employees were treated more favorably. *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011); *Stanciel v. Donahoe*, 570 F. App'x 578, 581 (6th Cir. 2014). Applying the appropriate test, Deister has sufficiently established a prima facie case of disability discrimination. As discussed, a reasonable finder of fact could find that Deister was disabled under the ADA. And the Auto Club has not disputed that Deister was otherwise qualified for the position, that he suffered an adverse employment decision, and that Deister's position remained open and he was ultimately replaced. Because Deister told his

18

supervisor that he was having panic attacks, provided human resources with a disability certificate, and then took medical leave, a jury could further find that the Auto Club knew or should have known of his disability.

### C.  The Auto Club's Stated Reason for Terminating Deister Was Not Pretextual

The Auto Club says it terminated Deister for refusing to return to his prior position after the expiration of his short term disability leave. The Auto Club has thus articulated a legitimate, non-discriminatory explanation for its employment action. The burden therefore shifts to Deister to show that a reasonable finder of fact could reasonably doubt the Auto Club's explanation— and thereby find that it was a pretext for discrimination. *See Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). A plaintiff can show pretext in three interrelated ways: "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012). The Auto Club argues that Deister cannot raise an issue of fact that this explanation was pretextual. (*See* Def.'s Mot. at 18–21; Def.'s Resp. at 21–24.) The Court agrees.

The Sixth Circuit has held that "[w]hen an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be 'mistaken, foolish, trivial, or baseless.'" *Tingle*, 692 F.3d at 531 (quoting *Chen*, 580 F.3d at 401).  The "key inquiry . . . is 'whether the employer made a reasonably informed and considered decision before taking' the complained-of action." *Id.* (quoting *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598–99 (6th Cir.2007)). Although the employer must point to particularized facts upon which it reasonably relied, the

19

Sixth Circuit does "not require that the decisional process used by the employer be optimal or that it left no stone unturned." *Id.*; *Michael*, 496 F.3d at 599.

The record is undisputed that unless Deister provided The Hartford with medical evidence that his disability extended beyond July 31, 2012, Deister was required to return to work on August 1, 2012. (Deister Dep. Ex. 13 at Pg ID 175.) There seems to be no dispute that he did not provide evidence to extend his leave. There is also no dispute that on August 1, the Auto Club's HR representative, Brockington, told Deister he must return to his former position because it had not been filled. (Deister Decl. ¶ 75; Def.'s Counter-Statement ¶ 50; *see* Brockington Dep. at 36; Deister Dep. at 160.) And there is no dispute that Deister told Brockington he would not return that day to his former position under the same manager, Ruby. (Deister Decl. ¶¶ 77, 80; Def.'s Counter-Statement ¶ 52; Brockington Dep. at 36, 61–63.) Nor is there any dispute that the termination letter sent to Deister stated: "In several telephone conversations with me, you stated that you are unable or unwilling to return to your previous position. . . . Because you have chosen not to return to your former position, your employment will be terminated." (Pl.'s Mot. Ex. 8; *see* Brockington Dep. at 56; Brockington Decl. ¶ 6.) The Auto Club has pointed to particularized facts upon which it reasonably relied. Even if Deister only meant to begin a conversation about reasonable accommodations, and not to flatly refuse to return to work, the Auto Club reasonably relied on his statement that he would not return to his former position when it terminated him. Moreover, there is no evidence that Deister ever contacted Brockington, Ruby, or anyone else at the Auto Club to explain that there was a misunderstanding after he received Brockington's letter.

And Deister has not produced evidence from which a jury could reasonably doubt the Auto Club's explanation. Deister argues that the Auto Club took the following discriminatory

actions: (1) Ruby failed to contact him about returning to work; (2) Ruby failed to issue the eForm to Human Resources to process Deister's return to work; (3) Hines delayed her appointment with Deister until his return date and assured him it would not be a problem; (4) Ruby's June 8, 2012, letter led him to believe he was in layoff status; (5) he could not search for other jobs at the Auto Club because his equipment was taken away; (6) he was never offered his old position; and (7) the Auto Club failed to make reasonable accommodations. (Pl.'s Resp. at 21–22; Pl.'s Mot. at 19–22; Pl.'s Reply at 3–4.)

First, although Deister tries to create a fact issue regarding the Auto Club's procedures for an employee returning to work and whether they were followed here, the evidence places the issue beyond dispute. The Summary Program Description for the Auto Club's short-term disability program provides that it was up to Deister to contact Ruby before his return date, not the other way around.  (Def.'s Mot. Ex. B at Pg ID 187.) Testimony from two Auto Club Human Resources employees as well as the email sent to Ruby and a screenshot from the Auto Club's intranet site establish that the eForm a returning employee's manager was supposed to submit was not required until the employee actually returned to work. (*See* Brockington Dep. at 41–42; Hines Dep. at 44–45, 47–48; Ruby Dep. Ex. 3 at Pg ID 1016; Pl.'s Resp. Ex. 6 at Pg ID 753.) Deister has not identified any evidence that indicates otherwise. The intranet screenshot to which he points is at best ambiguous. It says the manager is to submit the eForm "[w]hen your employee is released to return to work or Hartford has denied or ended benefits." (Pl.'s Resp. Ex. 12.) It does not absolve the employee of any responsibility to contact his manager to start the process, and it does not say that the eForm is to be submitted before the employee returns to work. In light of the other evidence, this is not enough to create a genuine issue of material fact.

And, regardless, Deister testified that he understood he was supposed to return to work on August 1. (Deister Dep. at 113, 117.)

Second, while Deister was apparently confused by the June 8, 2012, letter from Ruby—and the Court agrees that it was confusing—it did state that he would not be placed in layoff status until "the company is notified by Hartford that you are no longer eligible for disability benefits." (Pl.'s Mot. Ex. 9.) And again, Deister testified that he understood he was supposed to return to work on August 1. (Deister Dep. at 113, 117.) Thus Deister's points (1), (2), and (4) do not create a fact issue on pretext. The letter also provided a phone number to call for assistance with applying for other jobs at the Auto Club, so Deister's argument in point (5) that he could not search for jobs because his computer was taken away is not reasonable. Nor is point (6), that Deister was never offered his old job; he does not dispute that Brockington, told Deister he *must* return to his former position.[4]

As to point (3), the fact that Hines told Deister she could not meet with him until August 1 is hardly suspicious because Deister only called to set up the appointment on July 24. Regardless, the relevance of this point is unclear. Deister seems to be arguing that Hines purposely delayed the meeting and then misled him into thinking it would be okay to wait until

---

[4] Deister also argues in his motion that because "[t]he Auto Club leave of absence policy requires all employees to lose their job if they have not returned to work within ninety days" and "also provides that after 12 months, they are permanently separated," "[t]his policy is discriminatory against employees who are disabled because they, unlike non-disabled individuals are not in control of the length of time that their leaves will last." (Pl.'s Mot. for Summ. J. at 22.) This argument, in addition to being underdeveloped, is foreclosed by the Sixth Circuit's holding in *Gantt v. Wilson Sporting Goods Co.*, where the court found that an employer's leave of absence policy that uniformly required termination of any employee who did not return to work at the expiration of the leave period was not evidence of discrimination. 143 F.3d 1042, 1045 (6th Cir. 1998); *see also* 29 C.F.R. § Pt. 1630, App. § 1630.5 ("Leave policies or benefit plans that are uniformly applied do not violate this part simply because they do not address the special needs of every individual with a disability."); *Melange v. City of Ctr. Line*, 482 F. App'x 81, 85 (6th Cir. 2012) (rejecting an employee's argument that her employer's leave policy violated the ADA).

August 1, and that turned out to be critically untrue when he was terminated for failing to report to work on August 1. But Auto Club's stated reason for terminating him was that he told Brockington he would not return to his former position, not that he failed to show up for work on August 1. And regardless, the fact that Deister's meeting with Hines was rescheduled to August 1 did not prevent him from reporting to work on that date.

On the other hand, Deister's failure to show up for work on August 1 does make it more reasonable that the Auto Club understood him to be refusing to return to his former position. And the Court is not persuaded by Deister's repeated argument that he did in fact show up for work because he worked from home. (Pl.'s Mot. at 7, 20, 21–22; Pl.'s Resp. at 9, 22.) No reasonable finder of fact could believe that Deister had returned to work from home without his equipment and without any contact with his supervisor. Nor was Deister's lack of identification to enter Auto Club's building a plausible obstacle; surely any new hire must show up on the first day without such identification. Although there does not appear to be any evidence on the point, it is difficult to imagine that the Auto Club does not have some manner of entry during business hours for those without identification cards.

As to Deister's point (7), as discussed below, Deister cannot show that the Auto Club failed to reasonably accommodate his disability.

Finally, Deister argues for the first time in his reply brief that the close temporal proximity of Deister's termination and his disability leave is "strong circumstantial evidence that his disability was 'a' factor that caused his separation." (Reply at 4.) But Deister has not provided any other evidence that the Auto Club's stated reason was pretextual, and this is not a case where the temporal proximity is so close that it could suffice by itself. Deister was not terminated until almost five months after the Auto Club learned of his protected conduct, when

23

he began his disability leave. *See Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 401 (6th Cir. 2010) ("At this point, our case law can fairly be characterized as recognizing the possibility that, on a particular set of facts, extremely close temporal proximity could permit an inference of retaliatory motive, but also recognizing that often evidence in addition to temporal proximity is required to permit the inference."); *cf. Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) (finding temporal proximity was evidence of causation where termination occurred on the same day the employer learned of protected conduct); *see also Donald v. Sybra, Inc.*, 667 F.3d 757, 763 (6th Cir. 2012) ("[T]he law in this circuit is clear that temporal proximity cannot be the sole basis for finding pretext."). Moreover, in this case the timing of Deister's termination equally supports Auto Club's articulated, legitimate reason.

In short, Deister's termination letter states a legitimate, non-discriminatory explanation for terminating him, and Deister has not produced evidence from which a finder of fact could reasonably doubt the explanation. *See Harb v. Mich. Bell Tel. Co.*, No. 06-11777, 2007 U.S. Dist. LEXIS 38524 (E.D. Mich. May 29, 2007) (granting employer summary judgment on disability discrimination claim where plaintiff could not establish that her termination for failure to return to work after disability leave was pretextual). The Auto Club is therefore entitled to summary judgment on Deister's claim of disability discrimination based on his termination.

### D.  Deister Cannot Establish Failure to Accommodate

Deister also argues that the Auto Club discriminated against him in violation of the ADA by failing to provide a reasonable accommodation or by failing to engage in an interactive process about reasonable accommodation. (*See* Pl.'s Mot. at 11–16, 19; Resp. at 13–18, 21.) These claims fail because Deister cannot meet his burdens to show that he requested an

accommodation, that the Auto Club knew he needed an accommodation, or that a reasonable accommodation was possible.

The definition of discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). The term "reasonable accommodation" may include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(8)(B).

To establish a prima facie case of failure to accommodate under the ADA, "a plaintiff must show that: (1) she is disabled within the meaning of the Act; (2) she is otherwise qualified for the position, with or without reasonable accommodation; (3) her employer knew or had reason to know about her disability; (4) she requested an accommodation; and (5) the employer failed to provide the necessary accommodation." *Judge v. Landscape Forms, Inc.*, No. 14-1362, 2014 WL 6610470, at *3 (6th Cir. Nov. 21, 2014) (citing *DiCarlo v. Potter*, 358 F.3d 408, 419 (6th Cir. 2004) (overruled on other grounds)). As part of this prima facie case, the plaintiff "bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable." *Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 870 (6th Cir. 2007) (quoting *Hedrick*, 355 F.3d at 457). The employer then bears the burden to demonstrate that any particular accommodation would impose an undue hardship. *Id.* at 983 (citing *DiCarlo*, 358 F.3d

25

at 419).[5] The burden on plaintiff to identify a reasonable accommodation focuses on "whether an accommodation is reasonable in the run of cases, whereas the undue hardship inquiry focuses on the hardships imposed by the plaintiff's preferred accommodation in the context of the particular [employer's] operations." *Keith v. Cnty. of Oakland*, 703 F.3d 918, 927 (6th Cir. 2013) (citations omitted).

### 1. *Deister Did Not Request an Accommodation*

The Court begins with the fourth element of the prima facie case: whether Deister requested an accommodation. Determining whether a request for accommodation has been made is not straightforward. A panel of the Sixth Circuit has explained:

> Our case law establishes no bright-line test for when the form of an employee's request is sufficiently clear to constitute a request for an accommodation. On one hand, we have held that the ADA does not require employees to "use the magic words 'accommodation' or even 'disability.'" *Leeds v. Potter*, 249 F. App'x 442, 449 (6th Cir. 2007). On the other hand, "[t]he employer is not required to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation." *Gantt*, 143 F.3d at 1046–47. The employee also must make it clear that the request is being made because of the employee's disability. *Leeds*, 249 F. App'x at 449.

*Judge*, 2014 WL 6610470, at *3. In *Leeds v. Potter*, 249 F. App'x 442 (6th Cir. 2007), the court of appeals agreed with the district court that the plaintiff's statements that his job was "kicking [his] ass" were "not nearly specific enough to be considered requests for accommodations" because "the request does need to make it clear from the context that it is being made in order to conform with existing medical restrictions." *Id.* at 449.

In *Stanciel v. Donahoe*, on appeal from summary judgment for the employer, a panel of the Sixth Circuit rejected the plaintiff's argument that he "made a 'blanket, permanent' request

---

[5] A different burden-shifting analysis applies if "if the plaintiff has direct evidence that the employer relied on his or her disability in making an adverse employment decision," but that is not the case here. *See Rorrer v. City of Stow*, 743 F.3d 1025, 1038 (6th Cir. 2014)

for reasonable accommodations in his certification of disability form completed during the hiring process." 570 F. App'x at 583.[6] The certification, from a state rehabilitation services counselor who had reviewed the job requirements and job site, stated that the plaintiff "has a severe disability" but "[h]as the ability to perform the duties of the position" and "[i]s physically and socially competent to maintain self in a work environment, either independently, or with continuing help as has been provided in after-work hours living." *Id.* at 584. The court said, "[i]n no way can this passage be reasonably construed as a perpetual request for an accommodation." *Id.*

Similarly here, no reasonable finder of fact could conclude that Deister was requesting an accommodation for his disability. During his deposition, Deister admitted several times that he never requested a reasonable accommodation other than to advise Brockington that she should review his medical records. Deister's testimony is reproduced at length here because it clearly shows that the only basis for his argument that he requested an accommodation is this request for a review of his medical records. The Auto Club's counsel began by asking Deister about his statement in the EEOC charge that he had requested an accommodation:

> Q. Okay. And then you go on and request accommodation due to mental health issue. What do you mean by that, "request accommodation?"
>
> A. Well, at the time, obviously this was written after the August 1st date—but I just wanted the company to perhaps be a little more understanding of what happened to me[.]
>
> . . .

---

[6] The plaintiff's employer was the United States Postal Service, so the claim was brought under the Rehabilitation Act, 29 U.S.C. §§ 701–797, which prohibits disability discrimination in federal programs, and which provides that the same standards should be applied to ADA and Rehabilitation Act discrimination claims. *See* 29 U.S.C.A. § 791(f).

Q. Okay. And I think we may have covered this, but I've got to follow up in the context of this. What understanding did you think at this time when you wrote this, the company didn't have that you wanted the company to get?

A. I don't think that—I guess the bleeding heart in me or something wanted them to know what had happened from a personal level face-to-face, not over a telephone or an e-mail or fax, and that, you know, I felt that there was some kind of retaliation going on perhaps that I wanted to try to see if we could nip in the bud. And, of course, as I said previously, my psychiatrist requested from me that we talk about any accommodation—a specific one.

Q. What did your psychiatrist suggest as an accommodation?

A. He did not. He said—he suggested that we talk about that once I determine what I'm going to be doing for AAA, assuming I have—at the time, assuming I was on layoff status and had the opportunity to seek other—another job.

Q. But I need to get back to accommodation. That's a bit of a term of art in our business. Had you ever asked for accommodation prior to your termination?

A. No.

Q. Not verbally nor in writing?

A. Well, I asked for a—review my medical records.

Q. Okay.

A. I asked them if they had reviewed my medical records.

Q. That was verbally?

A. Yes.

Q. You never asked for an accommodation in writing?

A. Prior to—no.

Q. Okay. And I still need to get—and I apologize for drilling down on this, but that's my job. Other than that your, as you say, your bleeding heart sense led you to want to explain to them what had happened to you, was there anything you wanted them to do to accommodate you?

A. Maybe a little compassion.

28

Q. Okay. But how does that fit into the work setting? I mean, nice for people to express compassion verbally and we hope everybody does it, but in terms of the work setting, is there anything you expected The Auto Club to do in terms of an accommodation?

A. Perhaps stop any retaliation.

. . .

Q. Okay. You go on there. "There was no consideration given to the request for accommodation that employee ultimately requested via telephone conversations with Rosita Brockington both on 8/1/2012 and again on 8/3/2012." Now, what's the request for accommodation that you made of Ms. Brockington on those two occasions?

A. Reviewing medical records.

Q. Reviewing medical records?

A. Yes.

Q. And did she say something like that, well, you know, I'm not a doctor, what will that—

A. She said nothing.

Q. Nothing?

A, She ignored the comment twice.

(Deister Dep. at 116–120.) Deister asks the court to find that a bare request to review medical records, with no statement that the employee is having difficulty with his job and no indication that the medical records might reveal a work-related limitation, creates an obligation in the employer.

The case law does not support such a heavy burden for the employer. Another district court came to the same conclusion on similar facts in *Badri v. Huron Hospital et al.*, 691 F. Supp. 2d 744 (N.D. Ohio 2010). There, the plaintiff argued that he "impliedly" requested an accommodation when his office manager, Ms. Morgan, submitted his medical records to his

supervisor, Dr. Chung, and "suggested that his unusual behavior was the result of Cushing's Syndrome." *Id.* at 761. The court found there was no evidence that this was a request for an accommodation, reasoning, "From Ms. Morgan's letter to Chung, it is clear that Plaintiff's medical records were offered for the solitary purpose of explaining his actions." *Id.* at 762. Here, Deister gave Brockington no explanation for why the medical records were being offered, making it even less likely that she would understand they were being offered as a request for a disability accommodation (as opposed to trying to convince her that he was ready to come back and work). Notably, Deister did not actually submit any medical records to the Auto Club, other than the certificate of disability at the start of his leave. *Cf. Mobley v. Miami Valley Hosp.*, --- Fed. App'x ---, No. 14-3665, 2015 WL 795310, at *7 (6th Cir. Feb. 25, 2015) ("[O]ur case law considers letters from physicians sufficient to notify an employer of the need to accommodate a disability.").

The Court concludes that no reasonable jury could find that Deister's request to review his medical records triggered a duty for the Auto Club to reasonably accommodate him.

### 2. The Auto Club Did Not Know Deister Needed an Accommodation

This finding does not end the inquiry, however, because there is some authority that suggests an employer could be liable for failure to accommodate even if the employee has not requested an accommodation. First, it is clear that the ADA makes employers responsible only for "*known* physical or mental limitations." 42 U.S.C. § 12112(b)(5)(A). Thus, according to the EEOC's interpretive guidance, "[i]n general," it is the employee's responsibility to request an accommodation:

> Employers are obligated to make reasonable accommodation only to the physical or mental limitations resulting from the disability of an individual with a disability that is known to the employer. Thus, an employer would not be expected to accommodate disabilities of which it is unaware. If an employee with a known

> disability is having difficulty performing his or her job, an employer may inquire whether the employee is in need of a reasonable accommodation. In general, however, it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed.

29 C.F.R. Pt. 1630 App. § 1630.9. And the Sixth Circuit has said, citing this EEOC guidance, that "[t]here is no question that the EEOC has placed the initial burden of requesting an accommodation on the employee. The employer is not required to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation." *Gantt*, 143 F.3d at 1046.

But the Sixth Circuit has also noted that "[t]he law requires no one to perform a useless act." *MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 344 (6th Cir. 2002). That case, *MX Group v. City of Covington*, involved a claim of disability discrimination by a public entity in violation of the ADA's requirement that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modification is necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7); *see* 42 U.S.C. § 12131(2). The plaintiff sued Covington, Kentucky, after the city repeatedly refused to issue zoning permits for the plaintiff's proposed methadone clinic and then amended the zoning code to prevent the plaintiff from opening such a clinic anywhere in the city. *MX Grp.*, 293 F.3d at 328–31. The district court granted judgment for the plaintiff after a bench trial. *Id.* at 328. On appeal, the city argued that it was not liable for failing to make a reasonable accommodation because the plaintiff sued without first seeking a text amendment to the ordinance or requesting a permitted or conditional use permit. *Id.* at 343–44. The court said "[f]irst, Plaintiff did request a reasonable accommodation when it sought approval for an alternative site for its clinic, albeit after it filed suit." *Id.* at 344. But the Court also said: "It would make little sense to require Plaintiff to seek from city officials a change in the ordinance to allow a methadone clinic to operate when city officials had been

meeting for months to promulgate a rule stating that no more such clinics could open in the city." *Id.*

In an unpublished case, the Sixth Circuit suggested that the same principle could apply to a failure to accommodate claim in an ADA employment case. *Clark v. Whirlpool Corp.*, 109 F. App'x 750, 755 (6th Cir. 2004). There, the plaintiff, a production worker, suffered a work-related injury to her back, left knee, right arm, and right foot that caused her to miss work for a month. *Id.* at 751. After her doctor released her to work without restrictions, she requested and received a conveyor to use in her work. *Id.* She was later transferred to a position that required more manual labor, but she did not request an accommodation and worked without restrictions until she went on another medical leave. *Id.* at 752. The district court granted the defendant summary judgment on her failure-to-accommodate claim, and the Sixth Circuit affirmed. The appellate court noted that "when a request would be futile, we have excused the failure to make it when the need for an accommodation was obvious to the employer," citing *MX Group*. *Id.* at 755. But the court found that in Clark's case, "there is no suggestion in the record that the plaintiff's request would not have been duly considered." *Id.*

Other circuit courts have explicitly held that in some circumstances, an employer is liable for failure to accommodate although the employee did not request an accommodation. For example, the Second Circuit has held that "an employer has a duty reasonably to accommodate an employee's disability if the disability is obvious—which is to say, if the employer knew or reasonably should have known that the employee was disabled." *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008). In *Bultemeyer v. Fort Wayne Comm. Schs.*, 100 F.3d 1281 (7th Cir. 1996), the Seventh Circuit held, in a case involving a paranoid schizophrenic and bipolar employee, that "[t]he employer has to meet the employee half-way, and if it appears that the

32

employee may need an accommodation but doesn't know how to ask for it, the employer should do what it can to help." *Id.* at 1285. In another unpublished Sixth Circuit case, the court noted the Seventh Circuit's holding in *Bultemeyer* but distinguished it, finding that the plaintiff's carpal tunnel syndrome "quite clearly does not impede his ability to request an accommodation, so he must request it in the first instance." *Brown v. Chase Brass & Copper Co.*, 14 F. App'x 482, 487 (6th Cir. 2001).

Another court in this district drew on this case law to develop the following test for when the fourth element of the prima facie case for failure to accommodate should be excused: "1) the disability at issue is a mental disability that is obvious or otherwise known to the employer without notice from the employee; 2) the employer has reason to believe that the employee is experiencing work problems because of that disability; and 3) and the nature of the disability impairs the employee's ability to request an accommodation." *Moloney v. Home Depot*, No. 11-10924, 2012 WL 1957627, at *14 (E.D. Mich. May 31, 2012). A panel of the Sixth Circuit that was asked by an appellant in another case to apply this test chose not to adopt it as the law of the circuit but said, "[a]ssuming arguendo that this three-part conjunctive test is the law of the circuit—which it is not—plaintiff cannot meet the second element." *Stanciel*, 570 F. App'x at 584.

Likewise here, assuming that in some circumstances an employer could be held liable for failure to accommodate where an employee has not requested one, Deister cannot establish that those circumstances are present because the Auto Club had no reason to believe Deister needed an accommodation and nothing in the record suggests he was incapable of requesting an accommodation. Although the Auto Club knew Deister had taken a medical leave because of panic attacks, they also knew that he had been cleared to return to work. They had no reason to

believe that his doctor released him with restrictions, and in fact his doctor had not given him any restrictions. (*See* Pl.'s Mot. Ex. 4 at Pg ID 446.) As a panel of the Sixth Circuit has said, "an employer cannot be said to know or have reason to know of an employee's disability where that employee returns to work without restriction or request for accommodation. The natural assumption in such a case is that the employee is fully fit for work." *Leeds*, 249 F. App'x at 449 (quoting *Hubbs v. Textron, Inc.*, 2000 WL 1032996, at *2, 2000 U.S. App. LEXIS 30465, at *7 (6th Cir. 2000)). The Court concludes that no reasonable jury could find that the Auto Club knew that Deister needed accommodation.

### 3. *Deister Cannot Show That an Accommodation Was Possible*

Deister maintains that at a minimum, his request to review his medical records triggered an obligation for the Auto Club to enter an interactive process to discuss accommodations. (Pl.'s Mot. at 11–16; Pl.'s Resp. at 13–18.) The ADA's implementing regulations provide: "To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation." 29 C.F.R. § 1630.2(o)(3). The Sixth Circuit has said that this "interactive process is mandatory, and both parties have a duty to participate in good faith." *Kleiber*, 485 F.3d at 871. "When a party obstructs the process or otherwise fails to participate in good faith, 'courts should attempt to isolate the cause of the breakdown and then assign responsibility.'" *Id.* (quoting *Bultemeyer*, 100 F.3d at 1285).

First, the Court has already found that Deister never requested an accommodation, and the Sixth Circuit has indicated that "if the employee never requests an accommodation, the employer's duty to engage in the interactive process is never triggered." *Melange*, 482 F. App'x at 85; *see also Lockard v. Gen. Motors Corp.*, 52 F. App'x 782, 788 (6th Cir. 2002) ("Because

34

we find Lockard failed to request a reasonable accommodation from her employer, the defendant's duty to engage in an interactive search for a reasonable accommodation never arose.").

Second, the Sixth Circuit has indicated that an employer is not liable for failing to engage in the interactive process unless the plaintiff can show that a reasonable accommodation was possible. *See Lafata v. Church of Christ Home for Aged*, 325 F. App'x 416, 422 (6th Cir. 2009) ("Employers 'who fail to engage in the interactive process in good faith[ ] face liability [under the ADA] if a reasonable accommodation would have been possible.'" (quoting *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1114 (9th Cir. 2000) (en banc), *judgment vacated on other grounds*, 535 U.S. 391 (2002))); *Trout v. Aerospace Testing Alliance*, 303 F. App'x 272, 274 n.** (6th Cir. 2008) ("[E]ven if ATA did not engage in a good faith interactive process, appellant cannot prevail on this point because Trout would be unable to establish that he could have been accommodated but for ATA's failure to engage in the interactive process."); *Breitfelder v. Leis*, 151 F. App'x 379, 386 (6th Cir. 2005) (finding there was no liability for failing to engage in interactive process where plaintiff's disability could not be reasonably accommodated); *see also Kleiber*, 485 F.3d at 872 noting that "some courts," including Sixth Circuit panels in unpublished decisions, "have concluded that a plaintiff-employee must show that a reasonable accommodation would have been possible if the employer is to be liable for conducting the interactive process in bad faith," but failing to reach the issue).

Deister has not met his burden to propose an objectively reasonable accommodation and show that it was possible. The only specific reasonable accommodation that Deister has

identified is to give him a different job at the Auto Club. (*See* Pl.'s Mot. at 14; Pl.'s Resp. at 16.)[7]

Employers do have a duty to locate a suitable position when a plaintiff's requested accommodation is a job transfer. *Rorrer*, 743 F.3d at 1040. But "to overcome summary judgment, the plaintiff generally must identify the specific job he seeks and demonstrate that he is qualified for that position." *Id.* (quoting *Kleiber*, 485 F.3d at 870). And "an employer need only reassign the employee to a vacant position." *Id.* (citing *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 634 (6th Cir. 1998)); *see also Burdett-Foster*, 574 F. App'x at 680 ("Even if Burdett-Foster had requested a transfer to a new position (and she made clear in her deposition that she had not), such an accommodation is reasonable only if there is another position for which she would have been qualified."); *Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 557 (6th Cir. 2008) (affirming summary judgment for employer in part because plaintiff failed to identify a specific job and demonstrate that she was qualified for it).

Deister has not identified a specific position for which he was qualified, that would have accommodated the needs of his disability, and that was vacant at the time of his termination.

---

[7] Deister also says that he asked to be placed under a different supervisor. (Pl.'s Mot. at 8-9; Pl.'s Resp. at 10-12.) But he rightly does not argue that this would be a reasonable accommodation. *See* EEOC Enforcement Guidance, Reasonable Accommodation and Undue Hardship under the Americans with Disabilities Act, No. 915.002, Answer to Question 33, available at http://www.eeoc.gov/policy/docs/accommodation.html (last visited Feb. 26, 2015) ("An employer does not have to provide an employee with a new supervisor as a reasonable accommodation."); *v. Blue Cross Blue Shield of Michigan*, 574 F. App'x 672, 680 (6th Cir. 2014) (affirming summary judgment for employer on failure-to-accommodate claim where employer denied employee's request to report to a different supervisor); *Coulson v. The Goodyear Tire & Rubber Co.*, 31 F. App'x 851, 858 (6th Cir. 2002) ("[A]lthough transfer can be a reasonable accommodation, under these circumstances it would not be. Coulson is seeking to force Goodyear to transfer him so that he will not be required to work with certain people."); *see also Fricke v. E.I. Dupont Co.*, 219 F. App'x 384, 389 (6th Cir. 2007) ("Personality conflicts, workplace stress, and being unable to work with a particular person or persons do not rise to the level of a 'disability' or inability to work for purposes of the ADA.").

Absent this showing, Deister cannot prevail on his ADA reasonable accommodation claim on summary judgment.

The rest of Deister's testimony and argument about reasonable accommodations boils down to an argument that either he should have been given more time to talk to his doctor about accommodations or that the Auto Club should have reviewed his medical records to identify accommodations. (*See* Pl.'s Resp. at 16, Pl.'s Mot. at 14; Deister Dep. at 116–25.) As to the former, Deister was off work for over 90 days—nothing suggests that this was not ample time to discuss with his doctor a possible accommodation. And discovery is now closed. If there was a reasonable accommodation that the Auto Club could have and should have provided, Deister must have identified it by now. He has not. The Auto Club will not be held liable for failing to engage in an interactive process to identify an accommodation.

The Court has also found that Deister did not request an accommodation and the Auto Club had no reason to know he needed one. The Auto Club is entitled to summary judgment on Deister's claim of disability discrimination based on failing to provide a reasonable accommodation or failing to engage in an interactive process about reasonable accommodation.

### E. Retaliation

Deister's complaint includes a claim for "retaliation discrimination." (Compl. Count III.) This claim is barred for failure to exhaust administrative remedies.

An employee may not file a suit under the ADA if he or she does not possess a right-to-sue letter from the EEOC because he or she has not exhausted his or her remedies. *See* 42 U.S.C. § 2000e-5(f)(1); 42 U.S.C. § 12117(a) (procedures from § 2000e–5 apply to ADA claims).[8]

---

[8] Although the administrative exhaustion requirement does not limit a district court's subject-matter jurisdiction, and therefore it can be waived if not raised, it is still a statutory prerequisite to maintaining claims brought under the ADA. *See Adamov v. U.S. Bank Nat. Ass'n*,

Thus, "[a]s a general rule, a[n ADA] plaintiff cannot bring claims in a lawsuit that were not included in his EEOC charge." *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 361 (6th Cir. 2010). Permitting an action "to encompass claims outside the reach of the EEOC charges would deprive the charged party of notice and would frustrate the EEOC's investigatory and conciliatory role." *Id.* at 362. Nonetheless, "because aggrieved employees—and not attorneys— usually file charges with the EEOC, their *pro se* complaints are construed liberally, so that courts may also consider claims that are reasonably related to or grow out of the factual allegations in the EEOC charge." *Id.* In *Younis*, the Sixth Circuit granted summary judgment against the plaintiff on his retaliation claim because "there is nothing in the narrative portion of the EEOC charge that could be interpreted as claiming retaliation, nor is there any language that would have put the EEOC or the employer on notice that Younis was alleging retaliation by Pinnacle." *Id.* at 363. Similarly here, Deister's EEOC charge did not put the EEOC or the Auto Club on notice of a retaliation charge.

Deister's complaint is not specific about the conduct he believes was retaliatory. (*See generally* Compl.) His summary judgment briefs are similarly generic. Deister merely quotes the ADA's retaliation provisions, and then says: "Applying this to our case, the individual acts of all of the Auto Club managers constitute 'interference' with the Plaintiff's 'exercise and enjoyment' of his rights granted by the ADA, and their acts, in the aggregate created a 'hostile environment' that resulted in the adverse tangible employment act of his being terminated." (Pl.'s Mot. at 23; Pl.'s Resp. at 23.) When asked at the hearing how the Auto Club retaliated, Deister, through

---

726 F.3d 851, 855 (6th Cir. 2013); *cf. Spengler v. Worthington Cylinders*, 615 F.3d 481, 489 (6th Cir. 2010) ("[A]lthough administrative exhaustion is still a statutory prerequisite to maintaining claims brought under the [Age Discrimination in Employment Act], the prerequisite does not state a limitation on federal courts' subject matter jurisdiction over such claims." (quoting *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 401 (6th Cir. 2008)).

counsel, said he wanted to come back to work and they "would not deal with him." During his deposition, Deister said that his supervisor Ruby retaliated against him by threatening legal action if he did not return his equipment. (Deister Dep. at 90–91). He also seems to have suggested that Ruby's June 8, 2012 letter, which explained that Deister's position could be filled in his absence because 90 days had elapsed, was retaliatory. (*See* Deister Dep. at 100, 109, 120.)

Deister's EEOC charge did not mention the June 26, 2012 letter about returning his equipment. (*See* Deister Dep. Ex. 17 at Pg ID 176.) He did describe the June 8 letter. (*See id.*) But he did not check the box for "retaliation," and there is nothing that indicates he believes the June 8 letter—or any other action—was a retaliation for protected conduct. The narrative section of the EEOC charge concludes: "I believe that I was denied a reasonable accommodation and have been discharged, *due to my disability*, in violation of the [ADA]." (*Id.* (emphasis added).) Deister's EEOC charge did not put the EEOC or the Auto Club on notice of a retaliation charge, and it is now too late for Deister to file a charge regarding events that took place in 2012. *See* 42 U.S.C. § 2000e-5(e). Indeed, it might be said that Deister's vague complaint and negligible summary-judgment briefing failed to give Auto Club notice of the basis for his retaliation claim even now. The Auto Club is therefore entitled to summary judgment on Deister's claim for retaliation discrimination in violation of the ADA.

## IV. CONCLUSION AND ORDER

For the reasons stated, the Auto Club's Motion for Summary Judgment (Dkt. 18) is GRANTED and Deister's Motion for Partial Summary Judgment (Dkt. 22) is DENIED. Judgment for the Auto Club on all claims will follow in a separate order.

s/Laurie J. Michelson<br>
LAURIE J. MICHELSON<br>
UNITED STATES DISTRICT JUDGE

Dated: March 5, 2015

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on March 5, 2015.

s/Jane Johnson
Case Manager to
Honorable Laurie J. Michelson